KATHLEEN MARCHESE, Plaintiff-Appellee, v. STEVEN VINCELETTE, Defendant-Appellant.

First District (2nd Division)   No. 1—93—1736

Opinion filed April 12, 1994.

Querrey & Harrow, Ltd., of Chicago (James W. Fessler and Michael Resis, of counsel), for appellant.

Fishman & Fishman & Saltzberg, P.C., of Chicago (John C. Pendergast and Scott D. Stephenson, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Plaintiff Kathleen Marchese brought suit against defendant Steven Vincelette for damages resulting from an automobile accident. At the close of the evidence, the circuit court directed a verdict for plaintiff and against defendant on the issue of liability, and the jury awarded plaintiff $217,000 in damages. On appeal, defendant contends that (1) the court improperly admitted plaintiff's treating physician's opinion regarding the permanency of her condition although he had not recently examined her; (2) the court erred in permitting plaintiff to present evidence regarding her lost wages al-

though she failed to comply with his notice to produce certain tax returns; and (3) the damage award was excessive and the result of passion and prejudice.

On January 29, 1988, plaintiff was driving on 35th Street in Cicero, Illinois, when she was struck from behind by a car driven by defendant. She filed a complaint, alleging that defendant's negligence was the direct and proximate cause of her injuries, including pain and mental anguish, lost earnings, and medical expenses. Defendant answered, admitting striking the rear of plaintiff's car, but denying that he was negligent or that plaintiff was injured to the extent she claimed.

At trial, defendant, called as an adverse witness, testified that he had struck the rear of plaintiff's car on his way home from work. Debra Smetana, a human resources information specialist at Dominick's Finer Foods, testified that plaintiff formerly worked at one of its stores, and that between January 29, 1988, and April 30, 1988, plaintiff had missed 432.34 hours of work at $8.90 per hour, for a total loss of $3,847.83.

Flora Ann Carbon, a physical therapist at Oak Park Hospital, testified that she first saw plaintiff on February 9, 1988. At that time, plaintiff told her that she was "rear ended" by another car and that she hit the steering wheel and her knees hit the dashboard. After examining plaintiff's range of motion, Carbon determined that "all of her cervical motions were limited and caused an increase in pain." She also determined that plaintiff had very severe spasms and much tenderness along both sides of the cervical area. Plaintiff also complained of tingling or numb-like sensations in both arms and said that pain radiated from her neck into her left shoulder and right jaw. On February 11, she attempted to give plaintiff a massage, but plaintiff could not tolerate the pain due to the tenderness. She then gave plaintiff a TENS unit, a low-grade electrical stimulant to help the body produce its own pain killers.

Carbon saw plaintiff several times over the next three weeks. Although plaintiff was able to start some mild exercise, on February 29, 1988, she still complained of severe pain in her neck and upper shoulders and had to take several pain pills. Carbon continued to see plaintiff until March 25, when plaintiff said that she began feeling better. On cross-examination, Carbon stated that plaintiff did not complete the 10 physical therapy sessions that had been prescribed by her doctor.

Plaintiff testified in her own behalf that, following the accident, she was taken by ambulance to the hospital where X rays of her spine were taken. Three days later, on Monday, February 1, 1988,

she went to her family doctor, Dr. Violetta Simov, because she was "sore from top to bottom." She complained of extreme pain in her head, neck, shoulder, and hands. Dr. Simov gave her a cervical collar and some prescriptions to reduce the swelling. Because the medication was not helping, she returned to Dr. Simov the following Monday and was told to attend physical therapy. She then attended physical therapy with Carbon, but did not attend all of the 10 sessions prescribed by Dr. Simov, because she wanted to return to work.

Because she was reassigned from working the deli counter to unloading new deli shipments, plaintiff quit her job at Dominick's and began driving a truck for the next three months. She then moved to California, as planned before the accident.

In California, she continued to have problems with her neck. She first saw Dr. Chernin and then in March 1989 she saw Dr. Gary Feldman. She returned for a further evaluation in May 1989, and complained of spasms in her shoulders, periodic numbness in her hand, and no improvement in the condition of her neck. He prescribed physical therapy, which lasted three months. Upon the conclusion of the therapy, she felt better but still sometimes suffered spasms.

In August 1991, she had another attack and could not control the spasm or pain. She went to Dr. Feldman and told him that her hand would tingle, burn, and then go numb. She saw other doctors through her HMO after that; she still had neck spasms, and numbness and stiffness in her hand.

Prior to the accident, she was very active in sports, including golf, weight lifting, horseback riding, baseball, softball, and water sports. Since the accident, she tried to play golf numerous times, but had difficulty holding a club for a long period of time. She could no longer lift weights and she did not participate in water sports other than swimming. She was able to perform her duties at work, but sometimes experienced spasms and pain, which she would alleviate by sitting and attempting to do the exercises she learned in therapy.

On cross-examination, she stated that she never had a CT scan, an MRI test, or an EMG test. She also stated that four months after the accident, she got a job driving a 37-ton truck carrying hot asphalt.

Dr. Violetta Simov testified that she was plaintiff's physician from 1984 to 1989, and that on February 1, 1988, plaintiff came to see her complaining of pain in her neck and back. Plaintiff was unable to move her head to the left or right; her neck muscle was in extreme spasm and felt like a board. She prescribed physical therapy. On April 11, 1988, plaintiff stated that she still had some problems, but was free of pain and wanted to return to work. She released plaintiff and expected her to fully recover.

On cross-examination, Dr. Simov testified that on April 11, 1988, plaintiff had the full range of motion, did not have any spasms, and did not have any indication of a herniated cervical disc.

Dr. Gary Feldman testified by way of evidence deposition that he first saw plaintiff in March 1989, and then saw her again on May 18, 1989. He diagnosed her condition as chronic myofascial syndrome and subscapularis tendinitis. He prescribed physical therapy, which plaintiff underwent one to three times a week from May through September 1989, until her symptoms subsided. She also wore a TENS unit to alleviate her pain.

On August 2, 1991, plaintiff's condition worsened, and he saw her again on that date and on August 15, 1991. He performed a neurological examination and concluded that she was now experiencing pain radiating down her arm, coupled with weakness and numbness in her right hand. He diagnosed her condition as nerve root impingement due to a possible disc herniation. He explained that a person can have a herniation for several years and not necessarily have the radiating pain. He determined that the herniation was the result of the accident on January 29, 1988. It was his opinion, "based upon a reasonable degree of medical and surgical certainty," that plaintiff's injuries were permanent. He further testified that her condition was chronic and can worsen at times and improve at times.

The parties stipulated that the life tables show that a 40-year-old woman, such as plaintiff, has a life expectancy of 40.6 years. Plaintiff then rested.

Defendant called Officer Terry Serwat of the Cicero police department, who testified that he responded to the accident on January 29, 1988, and did not see any visible injuries or register any complaints in his report.

Defendant then recalled plaintiff, who testified that, when she returned to work at Dominick's, she worked only 16 hours a week rather than the 40 she had worked before the accident. Defendant then rested.

Plaintiff then moved for a directed verdict on the issue of liability, defendant made no objection, and the court granted the motion. The court then instructed the jury to determine only the appropriate measure of damages. As previously noted, the jury returned a general verdict of $217,000. This appeal followed.

Defendant first contends that the circuit court abused its discretion when it overruled his objection to Dr. Feldman's testimony regarding the permanency of plaintiff's condition. He asserts that because Dr. Feldman had not examined her for approximately 15 months before giving his testimony, his opinion was not based on a

recent examination and could not be admitted. Defendant also argues that Dr. Feldman's opinion that plaintiff had a herniated cervical disc should have been barred because it was "highly speculative" since he never recommended a CT scan, an MRI test, or an EMG test to determine if she in fact had a herniated disc. In response, plaintiff maintains that Dr. Feldman's opinion was properly admitted because, although the case law prohibits testimony regarding a doctor's opinion of a patient's prognosis unless it was based on a recent examination, it nevertheless allows opinion testimony regarding the permanency of a patient's condition. As to defendant's argument concerning the speculative nature of Dr. Feldman's opinion, she asserts that the opinion testimony was sufficiently grounded in a reasonable degree of medical certainty and was not speculative.

■ In Illinois, a physician may not testify at trial regarding his opinion of a patient's prognosis unless it was based on a recent examination. (*Henricks v. Nyberg, Inc.* (1976), 41 Ill. App. 3d 25, 28, 353 N.E.2d 273 (finding that the circuit court improperly admitted a doctor's testimony regarding the plaintiff's prognosis because it was based on just three weeks of treatment rendered three years earlier and was therefore unreliable); see also *Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171, 176, 533 N.E.2d 894 (citing *Henricks*, 41 Ill. App. 3d 25, 353 N.E.2d 273).) The purpose underlying this rule is that only opinions held at the time of trial can be considered by the trier of fact (*Henricks*, 41 Ill. App. 3d at 28), and "[a] present opinion based upon an examination a number of years prior to trial cannot represent an opinion at the time of trial." (*Wilson v. Chicago Transit Authority* (1987), 159 Ill. App. 3d 1043, 1044, 513 N.E.2d 443, *aff'd* (1988), 126 Ill. 2d 171, 533 N.E.2d 894.) Some courts, however, have limited the rule of *Henricks* by holding that although an opinion may not be given regarding the prognosis without a recent examination, a doctor may give his opinion regarding the "nature, extent and permanency" of the injuries. (*Thurmond v. Monroe* (1992), 235 Ill. App. 3d 281, 291, 601 N.E.2d 1048, *appeal granted* (1993), 148 Ill. 2d 654, 610 N.E.2d 1276 (holding that the opinion testimony was properly admitted even though it was based upon an examination which took place "several years" prior to trial); see also *Courtney v. Allied Filter Engineering, Inc.* (1989), 181 Ill. App. 3d 222, 231, 536 N.E.2d 952 (distinguishing *Henricks* on the basis that the physician's conclusion that the plaintiff's condition had reached a permanent state was adequately supported where he had treated the plaintiff for a period of two years, even though he had not examined him for four years prior to trial).) Although these courts find a distinction between "prognosis" and "permanence," we believe that the difference is one of semantics rather than substance.

■ "Prognosis" is defined as "a forecast of the outcome of a disease" (Stedman's Medical Dictionary 1145 (24th ed. 1982)), and "permanent" is defined as "continuing or enduring *** without fundamental or marked change" (Webster's Third New International Dictionary 1683 (1986)). Thus, whether or not a disease or condition is permanent in nature is an aspect of a doctor's prognosis. This view is also supported by the case law. In his dissent in *Wilson*, Justice Ryan stated that under *Henricks* "an opinion as to the *permanency* of an injury formulated long before trial is not admissible." (Emphasis added.) (*Wilson*, 126 Ill. 2d at 177 (Ryan, J., dissenting).) Also, in *Phelps v. Chicago Transit Authority* (1991), 224 Ill. App. 3d 229, 586 N.E.2d 352, the court stated that "[u]nder Illinois law, a treating physician may give opinion testimony regarding the *permanency* of a patient's injuries, providing a recent examination has been performed." (Emphasis added.) (*Phelps*, 224 Ill. App. 3d at 232 (citing *Wilson* and *Henricks*).) Thus, under the rule of *Henricks*, we reject as unsound any distinction between expert testimony regarding permanency and prognosis.

■ Having found no significant difference between permanence and prognosis, we must determine whether the circuit court abused its discretion in admitting Dr. Feldman's testimony. Prior to allowing Dr. Feldman's evidence deposition to be presented to the jury, the court heard all of defendant's objections to the testimony. When defendant asserted that the doctor could not give his opinion as to the permanence of plaintiff's condition because he had not examined her recently, the court stated that because he had treated her over a period of years, it would admit his opinion. The court stated:

> "So, I decline to exclude the evidence as a matter of discretion. I believe that it is relevant or there is sufficient basis for it in the testimony and the observations and so on to back up this conclusion or back up this conclusion as a matter of law. It's a matter for the jury as to how much weight they want to give this testimony."

Although an examination 15 months earlier can hardly be considered "recent," we believe that the circuit court properly exercised its discretion in allowing the testimony because the interval between examination and testimony was not as lengthy as in *Henricks*, and because the opinion was reached after a course of treatment which extended over a period of years. Any questions regarding the validity of Dr. Feldman's opinion based on the time interval went to the weight of his testimony rather than its admissibility. Although defendant offered no evidence to counter Dr. Feldman's conclusion that plaintiff's condition was permanent, he

did argue to the jury that the opinion was unconvincing because it was based on an examination 15 months earlier. The jury apparently was unpersuaded by defendant's arguments, however, and we find no reason to question its factual determinations. See *Carney v. Smith* (1992), 240 Ill. App. 3d 650, 659, 608 N.E.2d 379.

Further, we reject defendant's contention that, because he did not conduct certain tests to verify his diagnosis of a herniated cervical disc, Dr. Feldman's testimony regarding plaintiff's condition was inappropriate or speculative. Essentially, defendant argues that before a medical opinion may be given, it must be absolutely certain. Rather than absolute certainty, however, an opinion need be based only on a reasonable degree of medical certainty. (*Hunter v. Chicago & North Western Transportation Co.* (1990), 200 Ill. App. 3d 458, 473, 558 N.E.2d 216.) In the instant case, Dr. Feldman expressly stated that his conclusions were based upon a "reasonable degree of medical and surgical certainty." The value of Dr. Feldman's opinions was left to the trier of fact, whose responsibility was to determine what weight to assign to his testimony. We find no abuse of discretion in the admission of Dr. Feldman's testimony.

■ Defendant next contends that the circuit court erred in allowing plaintiff to present evidence regarding her lost wages when she failed to comply with his Supreme Court Rule 237 (134 Ill. 2d R. 237) notice to produce her tax returns and W-2 forms. He maintains that plaintiff's failure to produce the requested tax forms was "unreasonable, deliberate and in disregard for the rules" and the court's refusal to impose sanctions was an abuse of discretion.

On October 29, 1992, defendant filed a Rule 237 notice to produce copies of all of plaintiff's Federal income tax returns and W-2 forms for the years 1987, 1988, and 1989. Two and a half weeks later, on November 16, 1992, just before the trial began, defendant waived his request for the 1987 tax forms, but moved to preclude plaintiff from presenting her wage loss claim because she did not produce her 1988 and 1989 tax forms as requested. Plaintiff responded that she did not have the tax forms and that defendant had not requested them through the normal course of discovery. She stated, however, that she did have records from her employer detailing her earnings for the relevant period. The court found that precluding the evidence "would be much too strenuous a sanction." It also stated that rather than a case of noncompliance, this was "simply a situation where somebody doesn't have a record."

Supreme Court Rule 237 provides in pertinent part:

"The appearance at the trial of a party or a person who at the time of the trial is an officer, director, or employee of a party may

be required by serving the party with a notice designating the person who is required to appear. *The notice also may require the production at the trial of documents or tangible things.* \*\*\* *Upon a failure to comply with the notice, the court may enter any order that is just, including any order provided for in Rule 219(c) that may be appropriate.*" (Emphasis added.) 134 Ill. 2d R. 237(b).

Our courts have stated that sanctions for Rule 237 violations are to be entered only when noncompliance is determined to be "unreasonable." (*Hawkins v. Wiggins* (1980), 92 Ill. App. 3d 278, 282, 415 N.E.2d 1179.) In determining whether such noncompliance is unreasonable, a court should ascertain whether or not the offending party's conduct was the result of a deliberate and pronounced disregard for the rules and the court. (*Hawkins*, 92 Ill. App. 3d at 282; *Sanchez v. Phillips* (1977), 46 Ill. App. 3d 430, 434, 361 N.E.2d 36.) Furthermore, if a sanction is to be imposed at all, the appropriateness of a particular sanction is a matter of discretion for the circuit court, whose ruling will not be reversed on appeal absent an abuse of that discretion. *Cedric Spring & Associates, Inc. v. N.E.I. Corp.* (1980), 81 Ill. App. 3d 1031, 1035, 402 N.E.2d 352.

Defendant cites *Hawkins v. Wiggins* for the proposition that a lost wage claim should be precluded where the plaintiff fails to comply with a notice to produce tax forms. In that case, the circuit court barred the plaintiff from asserting his lost wage claim where he had failed, over a period of almost four years, to produce the requested tax forms even though there was an outstanding discovery request. The defendant first requested the documents in his notice of deposition which was mailed on July 22, 1975. At the deposition on December 11, 1975, the plaintiff failed to bring the return, but said that he had it in his possession and would make it available. Three years later, on December 18, 1978, the defendant filed a Rule 237 notice to the plaintiff to produce his tax returns and W-2 forms for the years 1974 through 1978. Eight months later, just before jury selection, the plaintiff's counsel told the court that the documents would be produced after lunch. After lunch, however, he told the court that the plaintiff could not find the records. The circuit court then granted the defendant's motion to bar all evidence relating to lost income. (*Hawkins*, 92 Ill. App. 3d at 280-81.) On appeal, this court found that the circuit court did not abuse its discretion in precluding the evidence. *Hawkins*, 92 Ill. App. 3d at 288.

In the instant case, we disagree with the circuit court's characterization that this was not a case of noncompliance, as the evidence is undisputed that plaintiff did not produce her tax forms as requested. (See *Hawkins*, 92 Ill. App. 3d at 282 ("it [is] no defense to the notice

that the records were not in his actual physical control").) It cannot be said, however, that plaintiff's failure to comply with defendant's request was "unreasonable." Unlike the defendant in *Hawkins*, defendant here made only one request for the documents, less than three weeks before the start of trial, and plaintiff was unable to produce them because she did not have them in her possession. Although it is true that she could have requested copies from the Internal Revenue Service (see 26 U.S.C. §§ 6103(e)(1)(A)(i), (p)(2)(A) (1988)), both the court and defense counsel recognized that she could not have obtained them in the short period involved here.

> "[DEFENSE COUNSEL]: For the record, *** it was filed October 29th of this year. It was a few weeks ago.
>
> [COURT]: You know, that's nineteen days—there is no way in the world that they would have been produced in that amount of time through ordinary channels by way of an authorization.
>
> [DEFENSE COUNSEL]: By way of an authorization, correct, but I did have to serve it in case perhaps she kept copies. She may have had copies in her possession. And I, of course, had to file the notice to determine that."

The foregoing colloquy constitutes an admission by defendant that the requested documents could not be obtained within the required time frame. Therefore, unlike the situation in *Hawkins*, it cannot be said that plaintiff's failure to produce the tax forms was unreasonable. Furthermore, because plaintiff disclosed a year earlier in her responses to defendant's interrogatories that she was going to pursue lost wages, defendant cannot assert that he was unable to seek the records at an earlier time. Accordingly, we find that the circuit court properly exercised its discretion in allowing plaintiff to present evidence regarding her lost wages.

■ Defendant's last contention is that the jury's verdict of $217,000 in damages is excessive and the result of passion and prejudice. He asserts that because plaintiff sought only $11,459.33 ($3,847.83 for lost wages and $7,611.50 for medical treatment) in economic damages, the jury's total damage award constituted a "windfall" which can be explained only by passion or prejudice.

In Illinois, the measure of damages is a question of fact to be decided by the trier of fact, and a reviewing court should not substitute its judgment for that of the trier of fact. (*Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 802, 450 N.E.2d 824.) A reviewing court will not disturb the verdict unless all reasonable persons would agree that the amount is excessive. (*Kottmeyer v. Consolidated R. Corp.* (1981), 98 Ill. App. 3d 365, 378, 424 N.E.2d 345.) An award is

considered excessive if it is outside the limits of fair and reasonable compensation, results from passion or prejudice, or is so large as to "shock the judicial conscience." (*Keenan v. Checker Taxi Cab Co.* (1993), 250 Ill. App. 3d 155, 164, 620 N.E.2d 1208.) Furthermore, whether an award is excessive must be decided from consideration of permanency and extent of the injury, possible future deterioration, medical expenses, and restrictions on daily activity due to the injury. *Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 280, 554 N.E.2d 266.

In the instant case, we are unable to review the jury's award because neither party tendered an itemized verdict form as required by section 2—1109 of the Code of Civil Procedure (735 ILCS 5/2—1109 (West 1992)); instead, the jury was allowed to return a general verdict form. Under section 2—1109, a jury verdict in a personal injury case must be itemized to reflect distribution between economic and noneconomic losses. (See *Florek v. Kennedy* (1993), 249 Ill. App. 3d 221, 234-35, 618 N.E.2d 760, *appeal denied* (1993), 152 Ill. 2d 558, 622 N.E.2d 1204.) Because it is impossible to determine accurately the jury's distribution of the economic and non-economic damages, we cannot determine if the award is excessive. *Florek,* 249 Ill. App. 3d at 234-35.

Moreover, a review of the record renders defendant's arguments unavailing. Plaintiff testified that she continued to have spasms and pain in her neck, arms, and hands, and that she had difficulty performing the same activities she was able to perform before the accident. She also presented testimony of two physicians and a physical therapist, all of whom explained the extent of her injuries. Dr. Feldman testified that, in his opinion, plaintiff's condition was permanent, and there was evidence that plaintiff's life expectancy was 40.6 years. Defendant offered nothing to rebut this evidence. Thus, the jury's verdict was not outside the limits of fair and reasonable compensation; nor does it appear to be the result of passion or prejudice, or so excessive as to shock the judicial conscience.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.